# IN THE COURT OF APPEALS OF TENNESSEE

# FILED

December 3, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

# AT NASHVILLE

ROBERT BEAN, FRANKLIN SHAFFER, )
DAVID AUTREY, MACK ROBERTS, )
KEVIN ANTLE, TOM NICHOLS, )
TAMMIE P. BEASLEY, and )
ROXANNE LUCE, )
                               )
    Plaintiffs/Appellants, )Appeal No.
                           )   M1999-01493-COA-R3-CV
VS.                   )
                           )   Davidson Chancery
NED RAY MCWHERTER, in his    )    No. 91-2558-I
capacity as Governor of the         )
State of Tennessee, CHARLES W.     )
BURSON, Attorney General of the    )
State of Tennessee, TENNESSEE     )
WILDLIFE RESOURCES COMMISSION,    )
and GARY MEYERS, as the Director of  )
the Tennessee Wildlife Resources Agency,  )
                           )
    Defendants/Appellees.         )

APPEALED FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

FOR APPELLANTS:              FOR APPELLEES:

F. CLAY BAILEY              PAUL R. SUMMERS
315 Deaderick Street          Attorney General & Reporter
Nashville, Tennessee 37238

ELIZABETH P. MCCARTER

AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED


BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

CONCUR:
KOCH, J.
CAIN, J.

# O P I N I O N


This is a constitutional challenge to an Act of the legislature regulating the possession and sale of animals. Owners, dealers, and licensed propagators of various wildlife species challenged the Act on grounds that it is vague, overbroad, and a burden on interstate commerce. The Chancery Court of Davidson County rejected the constitutional challenge. We affirm the decision on the vagueness and overbreadth charge. We think, however, that there are disputed facts bearing on the question of whether parts of the Act impermissibly burden interstate commerce. We, therefore, remand for further proceedings on that issue.


**I.**


This is the second round of a broad attack on Tenn. Code Ann. § 70-4-401, et seq. which classifies wild animals into five general classes and regulates their possession, sale, propagation or transfer. The first round resulted in a decision of the Supreme Court overruling a challenge to the Act

on the ground that the delegation of the power to an administrative agency to add to or delete species from Classes I and III violated the Tennessee Constitution. *See Bean v. McWherter*, 953 S.W.2d 197 (Tenn. 1997). On remand the chancery court overruled the remaining challenges to the Act.

## II.

## Vagueness of Wildlife Classifications

The appellants' attack on the statute centers on the classifications set out in Tenn. Code Ann. § 70-4-403. We reproduce that section here in its entirety:

> **Classifications of wildlife:** – Live wildlife, kept and maintained for any purpose, shall be classified in the following five (5) classes:
>
> (1) Class I – This class includes all species inherently dangerous to humans. These species may only be possessed by zoos, circuses and commercial propagators, except as otherwise provided in this part. The commission, in conjunction with the commissioner of agriculture, may add or delete species from the list of Class I wildlife by promulgating rules and regulations. The following is a listing of animals considered inherently dangerous:
> (A)  Mammals:
> (i)  Primates – Gorillas, orangutans, chimpanzees, gibbons, siamangs, mandrills, drills, baboons, Gelada baboons;
> (ii)  Carnivores:
> (*a*)  Wolves – All species;
> (*b*)  Bears – All species; and
> (*c*)  Lions, tigers, leopards, jaguars, cheetahs, cougars – All species;
> (iii)  Order Proboscidia: Elephants – All species;
> (iv)  Order Perissodactyla: Rhinoceroses – All species; and
> (v)  Order Artiodactyla: Hippopotamus, African buffalo;
> (B)  Reptiles:
> (i)  Order Crocodylia: Crocodiles and alligators – All species; and
> (ii)  Order Serpentes: Snakes – All poisonous species; and
> (C)  Amphibians: All poisonous species;

(2)     Class II – This class includes native species, except those listed in other classes;

(3)     Class III – This class requires no permits except those required by the department of agriculture, and includes all species not listed in other classes and includes, but is not limited to, those listed in subdivisions (3)(A)-(Q).  The commission, in conjunction with the commissioner of agriculture, may add or delete species from the list of Class III wildlife by promulgating rules and regulations:
(A)     Nonpoisonous reptiles and amphibians except caimans and gavials;
(B)     Rodents – Gerbils, hamsters, guinea pigs, rats, mice, squirrels and chipmunks;
(C)     Rabbits, hares, moles and shrews;
(D)     Ferrets and chinchillas;
(E)     Llamas, alpacas, guanacos, vicunas, camels, giraffes and bison;
(F)     Avian species not otherwise listed, excluding North American game birds, ostriches and cassowary;
(G)     Semi-domestic hogs, sheep and goats;
(H)     All fish held in aquaria;
(I)     Bovidae not otherwise listed;
(J)     Marsupials;
(K)     Common domestic farm animals;
(L)     Equidae;
(M)     Primates not otherwise listed;
(N)     Bobcat/domestic cat hybrids;
(O)     Hybrids resulting from a cross between a Class II species and domestic animal or Class III species;
(P)     Cervidae except white-tailed deer; and

(Q)     Furbearing mammals, including those native to Tennessee, raised solely for the sale of fur;

(4)     Class IV – This class includes those native species that may be possessed only by zoos and temporary exhibitors; provided, that rehabilitation facilities may possess Class IV wildlife as provided by rules established by the commission if authorized by a letter from the director of the agency:
(A)     Black bear (Ursus americanus);
(B)     White-tailed deer (Odocoileus virginianus);
(C)     Wild turkey (Meleagris gallapavo)(including the eggs thereof);
(D)     [Deleted by 1996 amendment.]
(E)     Hybrids of a Class IV species other than bobcat shall be Class IV; and
(F)     Animals that are morphologically indistinguishable from native Class IV wildlife shall be Class IV; and

(5)     Class V – This class includes such species that the commission, in conjunction with the commissioner of agriculture, may designate by rules and regulations as injurious to the environment.  Species so designated may only be held in zoos under such conditions as to prevent the release or escape of such wildlife into the environment.

The Act makes certain conduct with respect to wild animals "unlawful."  Therefore, it must give a person of ordinary intelligence "fair warning" of what is proscribed.  *State v. Thomas*, 635 S.W.2d 114 (Tenn. 1982).  Otherwise, it violates the due process clause of the Fourteenth Amendment to the United States Constitution.  *U.S. v. Lanier*, 520 U.S. 259 (1997).  An act violates due process if "men of common intelligence must necessarily guess at its meaning and differ as to its application."  *Id.* at 266.

## A.  *Bean* I

The Attorney General argues that the Supreme Court in *Bean* I essentially decided that these classifications are reasonable and intelligible on their face.  The Court said:

> We have carefully considered the entire statutory scheme and find that the statute implies a standard of reasonableness.  We further find that the statute's guidelines are that animals possessing characteristics consistent with the legislature's listed examples and statutory definitions are to be classified pursuant to the legislative scheme.  These standards are clearly adequate to allow both us and the TWRC to determine whether the legislature's intent is being furthered.

953 S.W.2d at 200.

We think that the State's argument that the Supreme Court <u>essentially</u> decided this issue is an admission that it did not <u>specifically</u> decide it.  And we are reluctant to conclude that a

**5**

constitutional defense to a charge of unlawful conduct does not exist because of what was inherent in the Supreme Court's decision on another issue. The only question addressed by the Court was whether the general assembly had the power to delegate the addition or deletion of species without express or specific standards. 953 S.W.2d at 199. Therefore, the issue of whether the classifications are too vague to be understood by persons of ordinary intelligence remains for our decision.

## B. A Fair Warning

We think that a person wishing to possess, breed, swap or transfer wildlife can, with reasonable effort, safely determine what the law requires. First, all wildlife for which some sort of a permit is required (Classes I and II), or which may be possessed only by zoos, circuses, and commercial propagators (Classes I and IV), or may also be possessed by rehabilitation facilities and temporary exhibitors (Class IV), can be determined by consulting the lists in the statute and the regulations of the Tennessee Wildlife Resources Commission. The appellants complain that Class I is too vague because it refers to animals that are "inherently dangerous." But that is a guideline for the Commission in deciding whether to add any species to the statutory list. All species coming under this class will be listed in the statute or the regulations. Anyone wishing to possess or deal with any animal may look at the lists to determine if it has been classed as inherently dangerous. No one will be required to guess the meaning of that term.

Class II includes native species except those listed in other classes. We think that is self-explanatory. If it is native and not on another list, it falls into this class.

Class III includes all species not listed in another class. The Commission has the power to

add to or delete species from this class, but the statute and the regulations determine the class boundaries. Nothing is left to speculation.

Class IV includes only those species listed in the statute. The Commission does not have the power to alter this class.

Class V includes only those species designated by the Commission. The appellants argue that "injurious to the environment" is impermissibly vague. However, as we pointed out with respect to Class I, no one is required to speculate about what that means. Only after the Commission, under its rulemaking authority, decides what species fit that description will the general public be affected. *See* Tenn. Code Ann. § 4-5-201, et seq. for the statutes governing the Commission's rulemaking authority.

Whether it is a good idea to give the Commission the power to make the decisions delegated to it by the Act is not the question. The Supreme Court has decided that the legislature may do so. Interested persons will be given a voice in the rulemaking process.

## III.

### Vagueness or Overbreadth of Tenn. Code Ann. § 70-4-405

Tenn. Code Ann. § 70-4-405 governs the housing and transportation of wildlife. Its pertinent sections are as follows:

> (a)     Wildlife housed in dangerously unsafe conditions constituting a threat to human safety shall, at the direction of agency personnel, be placed in agency approved facilities at the owner's expense.

(b)     Any condition which results in wildlife escaping from its enclosure, cage, leash or other constraint shall be considered maintaining wildlife in an unsafe manner and shall be a violation of this part.

\* \* \*

(d)     No person shall maintain any wildlife in captivity in any unsanitary or unsafe condition or in a manner which results in the maltreatment or neglect of such wildlife, nor shall any species of wildlife be confined in any cage or enclosure which does not meet the cage specifications.

The appellants argue that subsection (b) applies to all species of animals – including those in Class III for which there are no caging or restraint requirements – and makes it a criminal offense if the animal escapes. Under this interpretation releasing a squirrel in a park or allowing a gerbil to escape its cage would be a criminal offense. Taking subsections (a), (b) and (d) of Tenn. Code Ann. § 70-4-405 as separate and discrete provisions one could make that assumption. Literally, then, walking a dog on a leash and allowing it to escape would be a criminal act. We think, however, that subsection (b) must be read in conjunction with subsection (a) which has as a qualification " constituting a threat to human safety." The reference in subsection (b) to enclosures, cages, and leashes must mean as necessary to protect human safety. This conclusion is strengthened by the inclusion in subsection (b) of the "unsafe" qualification that also appears in subsection (a). Reading the sections together, we conclude that it is not a crime to allow an animal to escape if the animal does not pose a threat to human safety.

## IV.

### Burden on Interstate Commerce

### a. The Permit Requirement

The appellants alleged that Tenn. Code Ann. § § 70-4-410 and 411 place an undue burden on interstate commerce in violation of the commerce clause of the United State Constitution. Art. I § 8, clause 3. *See Lewis v. B.T. Investment Managers, Inc.*, 447 U.S. 27 (1980). Specifically, they cite subsections (b) and (c) of § 70-4-410 and subsections (a) and (c) of § 70-4-411. Those sections are as follows:

> (b)      Any nonresident who enters the state for the purpose of selling Class I or Class II wildlife species in this state shall also be required to purchase and possess a permit.
>
> (c)      All permits under this section shall comply with all provisions of the United States Code and the Code of Federal Regulations relating to exotic animals, their care, propagation, importation and sale.

Tenn. Code Ann. § 70-4-410.

> (a)      All persons wishing to possess Classes I and II live wildlife obtained outside the state of Tennessee shall have in their possession the importation permit required by this part. The permit and all bills of lading and shipping papers relating to any wildlife which such person may have in such person's possession shall be open and available for inspection at all reasonable times by authorized agency officers and employees for the purpose of ensuring compliance with the provisions of this part.
>
> (c)      An importation permit is required for all interstate movement of live wildlife except Class III, except no permit is required for zoos and temporary exhibitors.

Tenn. Code Ann. § 70-4-411.

The appellants argue that taken together these subsections impose an undue burden on interstate commerce because (1) no intelligent person can identify the class that comes under the permit requirement and (2) making all permits comply with the CFR provisions relating to exotic animals unduly burdens the traffic in native animals.

Not all state regulations that burden commerce among the states are prohibited by the commerce clause. States may address matters of legitimate local concern even though interstate commerce may also be affected. *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). State legislation impacting interstate commerce is not prohibited where the law "regulates evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental, and the burden imposed on interstate commerce is not clearly excessive in relation to the local benefits." *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520 at 530 (Tenn. 1993).

The appellants do not question the state's legitimate interests in the objects of the permit requirements (knowing where dangerous species are kept and under what conditions; being able to inspect animals that are imported into Tennessee), but they assert that the vagueness of the statute unreasonably burdens interstate commerce. We have already addressed the appellants' vagueness argument. We will not repeat that analysis here. Needless to say, we do not think the statute is impermissibly vague.

With respect to the requirement that permit holders must comply with federal permit requirements relating to exotic animals, the Tennessee Wildlife Resource Agency (TWRA) has interpreted subsection (c) as applying only to wildlife in Class I that are non-native to the United States. The state concedes that read literally the statute would produce an absurd result. But courts must presume that the legislature did not intend an absurdity. Where possible, the courts should adopt a reasonable construction of a statute that provides for harmonious operation of the laws and avoids a constitutional conflict. *Fletcher v. State*, 951 S.W.2d 378 (Tenn. 1997). Although the TWRA's construction of this statute may be pushing the outside limit, *see Covington Pike Toyota,*

*Inc. v. Cardwell*, 829 S.W.2d 132 (Tenn. 1992), we think the interpretation is reasonable, and applies the exotic animals requirements of the federal regulations only to those who handle exotic animals.

### b. Importation and Farming of White-Tailed Deer

White-tailed deer are included in Class IV, along with black bears, wild turkeys, etc., as animals that may only be possessed by zoos, temporary exhibitors, and rehabilitation facilities. This effectively prohibits the importation of white-tailed deer for the purpose of deer farming.

According to affidavits in the record, white-tailed deer farming is common in other states. Farmers breed and raise the animals for the meat and the antlers. White-tailed deer adapt well to captivity and are more practical to raise than other exotic animals.

The State insists that the Act is not discriminatory because it treats all white-tailed deer alike, regardless of the origin. Also the State's objectives are to prevent (1) the spread of disease from captive herds to the wild animals; (2) domestication of white-tailed deer, which raises issues of safety to the residents of the state; (3) a decrease in the native population by deer being taken from the wild; and (4) the creation of an illegal market in white-tailed deer.

Whether the Act promotes any of these objectives is sharply controverted in the record. Since the appellants' attack on this portion of the statute is based on the undue burden on interstate commerce, the question is a factual one, *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), and the appellants have the burden of proving that the ban on the private possession of white-tailed deer is

excessive compared to the benefits the State seeks to promote. *Dorrance v. McCarthy*, 957 F.2d 761 (10ᵗʰ Cir. 1992).

*Dorrance v. McCarthy* is a case similar to this one. Wyoming enacted a ban on the possession of animals classified as "big trophy game animals." The plaintiff wished to raise big game animals for meat production and possible controlled hunting. Wyoming advanced essentially the same argument in that case that the State argues here; i.e., disease prevention, preservation of a free-ranging wildlife resource, etc. The plaintiffs by affidavit attacked the conclusion that the total ban on possession of big game animals was necessary to accomplish these purposes. The court concluded that the affidavits raised factual issues that made summary judgment improper. *See* Rule 56, Tenn. R. Civ. Proc.

We think there is a question of fact as to whether the near-total ban on the importation of white-tailed deer is necessary to promote the State's objectives. The State argues that the appellants did not offer any specific less drastic alternatives; therefore they failed to carry their burden. This is a case decided on summary judgment, however, and we think that at this point there is evidence from which a trier of fact could conclude that the ban on farming white-tailed deer has no relation to the State's stated objectives.

We remand the cause to the lower court for a determination of the factual question as to whether the ban on farming white-tailed deer imposes an undue burden on interstate commerce.

The judgment of the lower court is affirmed in part, reversed in part, and remanded for further proceedings. Tax the costs on appeal equally to the appellants and the appellee.

_____
BEN H. CANTRELL,
PRESIDING JUDGE, M.S.


CONCUR:




_____
WILLIAM C. KOCH, JR., JUDGE




_____
WILLIAM B. CAIN, JUDGE